Filed 9/8/21  P. v. Phillips CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>COBY JEROME PHILLIPS,<br><br>    Defendant and Appellant. | A151534<br><br>(Contra Costa County<br>Super. Ct. No. 05-150124-6-01) |

**PUBLIC—REDACTS MATERIAL FROM SEALED RECORD[1]**

Defendant Coby Jerome Phillips appeals from his conviction for first degree murder and dissuading a witness from testifying.  Defendant raises multiple claims of instructional error, challenges the sufficiency of the evidence supporting the dissuading a witness charges, and contends the trial court erroneously excluded impeachment evidence concerning two witnesses who testified at his trial.  Defendant asks us to conduct an independent review of documents provided in camera to the trial court to determine whether records subpoenaed by the defense should have been disclosed to

---

[1] The trial court sealed certain records discussed in this case, which were also filed under seal in this court.  We have concurrently filed both public (redacted) and sealed (unredacted) versions of this opinion.  (Cal. Rules of Court, rule 8.46(g)(1) & (2).)  We order the unredacted version of this opinion sealed.

defense counsel. Defendant also argues his trial counsel rendered ineffective assistance by failing to object to various instances of alleged prosecutorial misconduct. Finally, defendant asks us to remand to allow the trial court to exercise its discretion whether to strike the personal use of a firearm enhancement and five-year prior conviction allegations under Senate Bill No. 620 (2017–2018 Reg. Sess.) and Senate Bill No. 1393 (2017–2018 Reg. Sess.), respectively.

We agree with defendant that the trial court prejudicially erred in instructing the jury on count two, and that the case should be remanded to allow the trial court to exercise its discretion with respect to the firearm and prior serious felony conviction enhancements. Otherwise, we affirm the judgment.

## I. PROCEDURAL AND FACTUAL BACKGROUND

This case has a lengthy and complicated procedural history and factual background and involves many witnesses and individuals not relevant to the claims raised on appeal. In this background section, we summarize the facts necessary to understand the claims asserted on appeal. In appropriate sections of the discussion, we provide additional facts as necessary to analyze particular claims.

### A. The Charges

Defendant was first tried for Darryl Grockett's murder in 2013. After a mistrial was declared, the Contra Costa County District Attorney sought a superseding indictment, charging defendant again with Grockett's murder and other crimes. Specifically, the January 2015 indictment charged

defendant with murder (Pen. Code,[2] § 187, subd. (a); count one), dissuading a witness by force or threat (§ 136.1, subd. (c)(1); count two), conspiring to dissuade a witness (§ 136.1, subd. (c)(2); count three), conspiracy to dissuade a witness by force or threat (§§ 182, subd. (a)(1), 136.1, subd. (c)(1); count four); custodial possession of a weapon (§ 4502, subd. (a); counts five to seven & ten to twelve), conspiracy to commit murder (§§ 182, subd. (a)(1), 187; count eight), and solicitation to commit murder (§ 653f, subd. (b); count nine). A firearm enhancement was alleged under section 12022.53, subdivisions (b), (d), and (e)(1) in count one, and enhancements under section 186.22, subdivision (b)(1) for gang activity were alleged in counts one through nine. Defendant was also charged with two prior "strikes" under sections 667 and 1170.12.

## B. *Darryl Grockett's Murder*

Darryl Grockett was a violent person, a drug dealer, a convicted felon, and a member of the Aryan Brotherhood (AB). On October 7, 2004, his body was found on a deserted gravel turnout on Crockett Boulevard, near the intersection with Cummings Skyway. Contra Costa County Sheriff's Detective Shawn Pate arrived at the scene and discovered Grockett dead, on his back in a pool of blood. Bullets were found on the ground underneath his body. Grockett had 13 gunshot wounds, including 11 entry wounds to the chest and abdomen, one wound to his right hand, and one wound that entered his mouth and was fired from close range. Several of the gunshot wounds were consistent with a person being shot while lying on their back, and a report indicated two different guns may have been used. In each of his

---

[2] All further statutory references are to the Penal Code unless otherwise indicated.

two shirt pockets was a roll of $20 bills in the amount of $1,000 ($2,000 total). A cell phone was recovered from his body at his autopsy.

A Chevrolet truck registered to an acquaintance of Grockett's was also found at the scene unlocked and with the keys in the ignition. Detective Pate traced the registration to a Phyllis M. and then drove to Matt B.'s house where he had previously seen cars registered in Phyllis M.'s name. Matt B. was Grockett's roommate. When Pate found Matt at the house and told him that Grockett was dead, he seemed surprised and upset.

## C. *Defendant and His Relationship with Grockett*

Defendant was a drug dealer and a friend of Grockett's. Defendant did not sell drugs to individuals on the street but was a wholesaler who sold to other dealers. Generally, he trafficked in methamphetamine. Defendant's supplier was Jose Vega-Robles, also known as "Carlos" or "Calacas."

Defendant was one of the founders and a leader of a gang called the Family Affiliated Irish Mafia (FAIM). In 2004, FAIM had about 50 to 75 members, and its primary activity was the sale of drugs, mostly methamphetamine. Other members of FAIM included Matt Donohue, Scott Schweiger, Thomas "Bubba" Covey—one of the founders of FAIM, and Bubba's brother, Tim Covey.

Defendant and Grockett were old friends. Grockett attended defendant's wedding to Stacey T. in 2003, and attended defendant's son's birthday party only a week before Grockett was murdered. One defense witness, Tara S., testified that at the birthday party, defendant and Grockett looked like "they were really good friends" and acted like family. Grockett told her that he had known defendant for a long time and he "was like family." Another defense witness, Phyllis M., knew both defendant and Grockett well. She used to babysit defendant and let Grockett drive two cars

4

registered in her name. Phyllis M. also attended defendant's son's birthday party. She agreed defendant and Grockett seemed to get along at the birthday party and testified that neither Grockett nor defendant told her they were having problems with the other.

Nonetheless, various other witnesses testified that Grockett and defendant had " 'friction' " between them or had had a " 'falling out.' " Defendant's wife, Stacey T., was aware there were "some issues" between defendant and Grockett over drugs and money. Defendant was wary of Grockett, and in September or October 2004, defendant had a drug deal pending with Grockett.

Ralph N., who had been in prison with both Grockett and defendant, testified that defendant and Grockett had been friends, but everyone knew that changed when Grockett put a gun to defendant's head. Grockett also told Ralph N. that he wanted to kill defendant. In 2004, defendant was afraid of Grockett.

Scott Schweiger told Detective Pate that Grockett had stolen $30,000 from defendant.

## D. October 7, 2004

### 1. Defendant's and Grockett's Phone Calls

On the day of Grockett's murder, Grockett's cell phone received calls from defendant's phone at 10:25 a.m., 3:45 p.m., 6:46 p.m., 7:04 p.m., 7:07 p.m., and 7:15 p.m. When interviewed a couple of weeks after Grockett's death, defendant admitted he had a phone conversation with Grockett around 7:00 p.m. on the night he died. Defendant said Grockett still owed

him $2,000 on a $6,000 drug deal. In a different interview, defendant said he learned of Grockett's death from Matt B. the morning after he died.

### 2. Sally S. and Tara S.

Sally S. had become romantically involved with Grockett about a month before his death. She was planning a big methamphetamine deal with Grockett just before he died. On the night of October 7, 2004, Grockett came over to Sally's house with Tara S.[3] to obtain the last of the $35,000 Sally owed him for the drugs. At one point, Grockett went outside to take a phone call, then told Sally and Tara he had to go. Tara had overheard Grockett on the telephone giving someone directions, which she thought involved crossing a bridge. Grockett told Tara she should go with him, then changed his mind and said he would be right back. Tara thought he took a lot of money with him when he left Sally's house. After some time, Tara began to wonder where Grockett was. Tara and Sally went to a bar. Tara became very upset because she and Sally had not heard from Grockett and kept trying to call him. Eventually, in a phone call between Tara and Matt B., Grockett's roommate, Matt told Tara and Sally that Grockett was dead.

### 3. Stacey T. and Jaime B.

On the evening of October 7, 2004, defendant borrowed an SUV from his girlfriend, Joanna N., and drove his wife, Stacey T., from their home in Vallejo to The Dead Fish restaurant in Crockett. There, defendant and Stacey met Jose Vega-Robles, Jose's girlfriend, Jamie B., and Jose's cousin, Josue Lomeli.[4] Jamie and Stacey stayed at the restaurant while the three

---

[3] Tara S., a defense witness at trial, had known Grockett for about two years and had been romantically involved with him at times.

[4] Jamie B. did not remember whether Josue was at the restaurant that night.

men left at around 7:00 p.m. in a blue Dodge pickup truck. Stacey knew they were going to meet Grockett and was very nervous about the meeting because she knew there was an issue between defendant and Grockett. Stacey told Jamie that the men were going to murder someone. They were gone about 45 minutes to an hour.

When the men returned to the restaurant, Jose and Josue appeared proud and excited.[5] Defendant seemed nervous. Defendant told Stacey that " 'we' " shot Grockett.

Defendant and Stacey then drove to Rodeo, where he took something wrapped in a towel into a house. Stacey and defendant spent the night at a hotel because they wanted to avoid going home where they anticipated encountering police investigating the murder or Grockett's friends.

Jamie B. later overhead defendant and Jose Vega-Robles talking about having killed someone. Jose spoke in broken English, but Jamie B. could understand him. He talked about having to drive away on a gravel road and having to get the truck fixed. When Jose said that "a guy" was dead, defendant did not respond.

Jose never told Jamie about a murder. She just knew something was weird and put together that there must have been a plan to kill people rather than a drug deal gone bad.

### E. Defendant's Confessions

#### 1. Sergio R.

Sergio R. is Jose Vega-Robles's brother. Sergio and Jose were in business together and imported drugs through a connection with the Sinaloa

---

[5] Jamie B. testified she did not remember if the three men returned to the restaurant.

cartel in Mexico. Sergio sold cocaine, and Jose sold methamphetamine and cocaine. Sergio met defendant in 2002 or 2003 through Jose. Defendant did drug deals with Jose, and Jose would sometimes trade drugs to defendant for weapons.

Sergio R. testified he was in Mexico in 2004 when Grockett was killed. He heard about it when he returned to the United States. His blue Dakota pickup truck was missing when he came back from Mexico but was returned to him a couple of weeks later. Jose said the truck had been at a body shop. Jose explained that defendant's friend was going to rob them of five pounds of drugs in a meeting that happened near Cummings Skyway, and that defendant had killed the man and Josue had shot up Sergio's truck.

Sergio R. never discussed the Cummings Skyway shooting with defendant. He did not remember previously testifying that defendant told him about the killing in a Vallejo parking lot. After having his recollection refreshed during a lunch break, Sergio remembered two conversations with defendant—one at the house and one in a Petco parking lot—in which defendant told Sergio that he had killed his friend because the friend was going to rob him of five pounds of drugs. Defendant told him they burned their clothing afterwards.

When Sergio R. testified at this trial, he was still facing criminal charges, in Contra Costa County, of conspiracy to murder Grockett and two other men, Jose H. and Marcelino Guzman-Mercado. He expected to be absolved of these charges after testifying against defendant.

Sergio R. had also been arrested in 2005 and convicted of conspiracy to sell drugs with Jose Vega-Robles and defendant. He was tried in Contra Costa County with defendant and Bubba Covey. When defendant found out that Sergio was cooperating with the police, he stopped talking to Sergio.

8

Once, during a court proceeding, defendant surreptitiously showed Sergio a picture of Sergio with information that he was an informant, in effect telling Sergio he was a "rat." Sergio was assaulted in jail the next day. After Sergio gave a statement to the Drug Enforcement Administration (DEA), his sentence of 15 years was reduced to 9 years based on his cooperation.

Sergio R. also testified that he had worked as an informant for Richmond Police Officer Michael Wang. Wang and a DEA special agent, Gina Giachetti, offered Sergio the possibility of a "green card" in exchange for his cooperation on a drug investigation. The green card was important to Sergio, because after it was revealed that he was cooperating with police, his life would be in danger if he were deported to Mexico.

### 2. Ralph N.

Ralph N. testified in person in this case in October 2016, and Detective Pate testified about an interview he had with Ralph in 2009 while investigating the Grockett murder. In addition, the trial court admitted prior testimony from previous hearings and trials related to Grockett's murder. Ralph admitted he had offered very different testimony on different occasions.

### a. Trial Testimony

At trial, Ralph N. testified he was a former member of the Nazi Low Riders (NLR) gang, a Caucasian gang subservient to the AB. Ralph joined the NLR in 1991 or 1992 when he was at the California Youth Authority. Ralph dropped out of the NLR and went through the debriefing process in 2009. Because Ralph had dropped out of the NLR, he could be hurt if he were discovered by the AB or the NLR. But Ralph also testified that now, 10 years later, he was a "has-been" and no one would do anything to him because he had dropped out.

Ralph N. did not identify defendant at trial. He said he had heard of defendant but did not know him. Ralph had heard of FAIM but did not know anything about it. Ralph also did not know Grockett, though he had heard his name at Pelican Bay State Prison (Pelican Bay). He did not know if Grockett and defendant were friends; he had never talked to defendant about Grockett; and defendant never told Ralph that he killed Grockett.

Ralph N. testified he was out of prison for about a month in September and October 2004. He was selling methamphetamine during that time. He did not get his meth from defendant.

Ralph N. acknowledged that he previously testified in May 2012, December 2013, April 2013, and January 2015, and gave different answers at different times.

### b. Prior Statements and Testimony

### i. Interview with Inspector Pate in 2009

Inspector Pate[6] testified briefly about interviewing Ralph N. in prison in 2009 while Pate was investigating the Grockett murder. Ralph told Pate he was debriefing at the time, and Pate recorded the interview. Ralph subsequently testified twice in court that he had lied in his interview with Pate.

### ii. Jose Vega-Robles's Trial—May 2012

At the Jose Vega-Robles trial in May 2012, Ralph N. testified that he had given a statement to Pate in 2009 that was not truthful. Ralph was an NLR dropout, and was on the NLR " 'bad news list, wanted dead or alive.' " Defendant shared a prison cell with Grockett at Pelican Bay. Ralph testified

---

[6] By 2008, Shawn Pate had left the Contra Costa County Sheriff's Office and was working as an inspector with the district attorney's office.

that Ronnie Yandell, a high-status AB member, had ordered Grockett and defendant to kill witnesses for him. Defendant and Grockett did not kill the witnesses. Yandell learned they did not kill the witnesses, and by not killing them, defendant "sealed his own fate."

Ralph N. also testified that Grockett and defendant had a falling out because defendant did not kill some witnesses in another case whom they had been ordered to kill. Grockett told Ralph that he wanted to kill defendant and told Ralph about putting a gun to defendant's head in 2004. Ralph testified that defendant did not have the AB's permission to put a shamrock tattoo on his face, and Ralph had been ordered to kill defendant because of the unauthorized tattoo and because defendant did not do what he was ordered to do.

Ralph N. did not talk with defendant about Grockett during 2004, and defendant did not ask Ralph to help him " 'set up' " Grockett, nor tell Ralph he wanted to get back at Grockett for pulling a gun on him. Defendant did not tell Ralph on the phone that he had killed Grockett.

Ralph N. sold methamphetamine when he was out of prison in 2004, but he did not get his drugs from defendant.

### iii. *Defendant's First Trial—April and May 2013*

At defendant's first trial in April and May 2013, Ralph N. testified that he had met defendant in jail 10 years before. Ralph knew Grockett but did not know if Grockett knew defendant. Ralph did not talk with defendant about Grockett pulling a gun on defendant, defendant did not say he wanted to get Grockett, and Ralph did not warn Grockett about defendant. Defendant did not admit he killed Grockett, and Ralph did not know who was involved in Grockett's death. He never met or was in communication with Ronnie Yandell. Ralph said everything he told law enforcement was " 'a

11

bullshit lie,' " and he did not know anything about FAIM or murders. Everything he told law enforcement in 2009 was put together from things he heard.

Ralph N. may have had a possible falling out with the NLR and AB over not hurting defendant. Ralph's brother, who was not involved in gangs and crime, was threatened by the NLR and AB, and was killed in 2009. At first, Ralph blamed defendant for his brother's death, but later learned defendant was not involved.

### iv. Defendant's Preliminary Hearing—December 2013

At defendant's preliminary hearing in December 2013, Ralph N. said he could not remember a rumor spreading through San Quentin State Prison that defendant killed Grockett or telling law enforcement in 2009 that members of the NLR wanted to kill defendant because Grockett was well liked. Ralph did not remember Yandell asking him to kill defendant or defendant asking him to set up Grockett so defendant could kill him.

### v. Grand Jury Testimony—January 2015

At a grand jury proceeding in January 2015, Ralph N. testified that he was a member of the NLR, that he had been in prison more than half his life, and that he and defendant sold drugs and did a lot of crimes together.

Ralph N. knew about a conflict between Grockett and defendant—they had a falling out when Grockett " 'wanted to do his own thing.' " Grockett was a gangster who was not afraid. In 2004, defendant was scared of Grockett. After Grockett died, defendant told Ralph that he had killed Grockett.

Ralph testified he sold methamphetamine in October and November 2004 that he got from defendant.

12

Ralph N. lied both during the Jose Vega-Robles trial and defendant's first trial when he said that everything he told Inspector Pate in 2009 was a lie. He told the truth in his interview with Pate, but then felt " 'really uncomfortable' " when he had to testify in court. He lied because he was worried about something happening to his family.

### 3. Scot Schweiger

Testimony from a conditional examination of Scot Schweiger in 2009 was admitted because Schweiger had subsequently died. He testified pursuant to a grant of use immunity. Schweiger was a FAIM member and knew defendant and Bubba Covey.

When serving time at the state prison at Jamestown, Schweiger met Matt Donohue, who asked him to join FAIM. Schweiger helped Donohue sell drugs on the prison yard at Jamestown. When he was paroled, he met other FAIM members, including defendant.

While visiting defendant's house in Vallejo, Schweiger learned that Grockett had been killed. Defendant walked with Schweiger out to the middle of the street and told him he had killed Grockett. He asked Schweiger to listen to what was being said in Santa Rosa and report back to defendant.

In a prior interview from 2007, Schweiger testified that defendant did not actually say he had killed Grockett; rather, defendant said that Grockett had gotten greedy over $30,000 and the look on defendant's face told Schweiger that defendant had killed Grockett.

### F. Dissuading Ralph N.

Correctional Officer Cory Perryman testified as a gang expert for the prosecution. Ralph N. was a validated NLR member who had dropped out of the gang and completed the lengthy debriefing process. Information from a debriefing could be dangerous for a dropout and his family. The penalty in

the gang world for debriefing can range from death to being shunned. If copies of Ralph N.'s debriefing document were being made and sent back out of the facility, his life could be in danger. Even if he were out of prison, distributing his debriefing would benefit FAIM by showing it could reach a person outside of prison. Perryman also testified that if debriefing paperwork gets out, it could encourage a person to change their testimony in the interest of self-preservation.

Deputy Sheriff Gabriella Arnaudo worked in the classification unit of the Martinez Detention Facility. On August 8, 2013, she was inspecting incoming inmate mail as part of her duties. A letter addressed to defendant caught her attention. The envelope had " 'legal mail' " written on it in "Sharpie," the address sticker looked homemade, and the attorney on the return address had not visited defendant or represented him according to jail records. Arnaudo opened the envelope looking for contraband, resealed it, and took it to defendant. She asked defendant to open it in front of her. She saw that one of the papers in the envelope said, "CDC Corrections" and "confidential," and had a photograph of Ralph N., whom she recognized as an enemy of defendant. Ralph N. was not in custody in Contra Costa County at the time.

Defendant told Arnaudo that his attorney, who was working for him on a child custody case, was making copies for him. Asked why he was making copies, defendant said, "[T]hat's how paperwork gets out." "Paperwork" in jail lingo is written information that is damaging to someone. Arnaudo confiscated one of the documents, which was Ralph N.'s debriefing document.

The parties stipulated that the attorney on the return address label was "deemed to have testified and that she testified" that neither she nor

anyone associated with her law firm made the envelope seized which contained the Ralph N. debriefing document.

## G. Conviction and Sentencing

Defendant eventually proceeded to trial on counts one through three and five through nine.[7] The jury returned guilty verdicts on all counts and found all enhancements true, except for the recidivist enhancements. On May 26, 2017, the trial court found one "strike" prior allegation true. The trial court granted a new trial on counts eight and nine.

Defendant was sentenced to a term of 80 years to life, consecutive to a determinate term of 25 years.

## II. DISCUSSION

## A. Imperfect Self-defense Voluntary Manslaughter Instruction

### 1. Additional Background

Defendant first contends the trial court erred by failing to instruct the jury on the lesser included crime of voluntary manslaughter based on imperfect self-defense. When defendant's trial counsel requested such an instruction, the trial court concluded there was insufficient evidence to warrant it. In making its ruling, the court stated:

"I just don't think there is any evidence. I honestly don't think there is any evidence that there was either defense or, you know, voluntary, based upon heat of passion or anything else. Because there is circumstantial evidence at the scene, in the Court's view, the circumstantial evidence supports one conclusion, that somebody went there to kill Darryl Grockett and did a good job of killing him by shooting him numerous times, a number of times while he's lying on the ground helpless. [¶] In other words, if he was

---

[7] Count four was dismissed as superfluous to count three.

still alive finishing the job when there was no possibility of somebody believing that self-defense was possible at that point. So he is shot. [¶] In the Court's view whether or not the first bullet hits him while there is some possibility of self-defense there are 11 others that continue to hit him, many of which happened after he's lying on the ground face up in all likelihood and there is no contradictory evidence, helpless and incapacitated, while somebody pumps additional bullets into him. [¶] If somebody had an available self-defense at some point in that process, they certainly didn't have it by the time they shot bullets 12 and 13 into him."

### 2. Analysis

"An instance of imperfect self-defense occurs when a defendant acts in the actual but unreasonable belief that he or she is in imminent danger of great bodily injury or death. [Citation.] Imperfect self-defense differs from complete self-defense, which requires not only an honest but also a reasonable belief of the need to defend oneself. [Citation.] It is well established that imperfect self-defense is not an affirmative defense. [Citation.] It is instead a shorthand way of describing one form of voluntary manslaughter. [Citation.] Because imperfect self-defense reduces an intentional, unlawful killing from murder to voluntary manslaughter by negating the element of malice, this form of voluntary manslaughter is considered a lesser and necessarily included offense of murder." (*People v. Simon* (2016) 1 Cal.5th 98, 132 (*Simon*).)

"A trial court has a sua sponte duty to instruct the jury on a lesser included uncharged offense if there is substantial evidence that would absolve the defendant from guilt of the greater, but not the lesser, offense. [Citation.] Substantial evidence is evidence from which a jury could conclude beyond a reasonable doubt that the lesser offense was committed.

[Citations.] Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense." (*Simon*, *supra*, 1 Cal.5th at p. 132.)

We review de novo a trial court's decision not to instruct the jury on imperfect self-defense.[8] (*Simon*, *supra*, 1 Cal.5th at p. 133.) In so doing, we evaluate the evidence in the light most favorable to the defendant. (See *People v. Woods* (2015) 241 Cal.App.4th 461, 475.)

A defendant acts in imperfect self-defense when (1) defendant actually believes that he or she is in imminent danger of being killed or suffering great bodily injury, and (2) he or she actually believes that the immediate use of deadly force is necessary to defend against the danger, but (3) at least one of those beliefs is unreasonable. (CALCRIM No. 571; *People v. Randle* (2005) 35 Cal.4th 987, 996–997, overruled on another ground in *People v. Chun* (2009) 45 Cal.4th 1172, 1201.) Our Supreme Court has explained that the doctrine of imperfect self-defense "is a ' "narrow" ' one and 'will apply only when the defendant has an actual belief in the need for self-defense and only when the defendant fears immediate harm that " ' "*must be instantly dealt with.*" ' " ' " (*People v. Landry* (2016) 2 Cal.5th 52, 97–98.)

---

[8] In his opening brief on appeal, defendant argues that the trial court erred by failing to instruct on imperfect self-defense and does not address perfect self-defense. The Attorney General argues that the trial court did not err in refusing to instruct on either perfect or imperfect self-defense. Because defendant did not raise an issue with respect to perfect self-defense in the opening brief, we do not address whether the trial court should have instructed on that theory. We note, however, that both perfect and imperfect self-defense require substantial evidence that defendant actually believed in the need to defend himself against imminent peril to life or great bodily injury—evidence which, as discussed below, we conclude was not present in this case. (*People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262.)

Defendant did not testify at trial and made no out-of-court statements indicating that he believed lethal force was necessary to defend his life or avoid great bodily injury.  (See, e.g., *Simon, supra*, 1 Cal.5th at p. 134.)  While that fact alone is not dispositive, there must be other substantial evidence of defendant's state of mind.  Such evidence is missing here.

Defendant points to substantial evidence in the record that Grockett had a reputation for violent behavior.  Grockett was usually armed, had shot, stabbed, and attacked people, and was a member of the AB, a gang that is well known for violent acts.  Defendant also cites Ralph N.'s testimony that Grockett held a gun to defendant's head at some point in 2004, the AB had ordered a hit on defendant, and Ralph's understanding that defendant was scared of Grockett.[9]  But the fear necessary to support an imperfect self-defense instruction must be of *imminent* harm and cannot be based upon generalized fear or past threats or assaults.  (*People v. Steskal* (2021) 11 Cal.5th 332, 345–346 (*Steskal*) [evidence of defendant's ongoing fear of law enforcement alone did not constitute substantial evidence he shot officer because he feared " 'a risk of imminent peril' "]; *People v. Manriquez* (2005) 37 Cal.4th 547, 581–582 (*Manriquez*) [evidence defendant may have feared some future harm not sufficient to require instruction on imperfect self-defense].)  While defendant presented evidence of Grockett's violent nature and past threats, there was no evidence defendant actually believed he was

---

[9] The extent to which this testimony showed defendant feared Grockett is unclear.  Ralph N. testified the gun incident between defendant and Grockett " 'would upset anybody' " but denied that *defendant* told Ralph he was bothered by it.  Ralph in fact testified defendant " 'never even really talked about it to me' " and did not say one word to him about the incident.  And while Ralph testified defendant " 'absolutely' " was scared of Grockett in 2004, he could not remember the content of his conversation with defendant.

in danger or was afraid when he and the others met Grockett at Cummings Skyway.[10]

Defendant also relies on evidence that Grockett said he wanted to kill defendant. But that testimony came from Ralph N., who said Grockett told *Ralph* that. There was no evidence that *defendant* knew Grockett said he wanted to kill defendant.

The only other evidence about what *defendant* was feeling or thinking before the murder came from Sergio R., who testified that both his brother and defendant told him that defendant killed Grockett because he was going to rob them of five pounds of drugs. Importantly, Sergio's testimony contained no suggestion that defendant thought he was in mortal danger and needed to use lethal force to protect himself from Grockett. Even if jurors believed that Grockett intended to rob defendant and Vega-Robles, there is no evidence from which jurors could make a reasonable, as opposed to speculative, finding as to defendant's state of mind when he shot Grockett.[11] (*Simon, supra,* 1 Cal.5th at p. 132 ["Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense."].)

Nor does evidence concerning the circumstances at Cummings Skyway support an inference that defendant believed he needed to use deadly force to

---

[10] Indeed, other evidence in the record suggested to the contrary. Two witnesses testified Grockett and defendant did not seem to have any problems with one another when they met at defendant's son's birthday party the week before the murder, and when interviewed, defendant said he called Grockett on the day of the murder to collect $2,000 Grockett owed him.

[11] Indeed, defense counsel conceded as much at trial, saying to the trial court: "Everything is speculation as to what [defendant] was thinking or why he did it. . . . there really is not evidence other than there was a shooting."

defend himself from Grockett. Grockett was shot 13 times in the chest, abdomen, and mouth, and some of the shots entered his body while he was already lying on the ground. No gun was found on Grockett's person or at the scene, and evidence was presented that defendant and Josue Lomeli were both armed. Although defendant cites to evidence Grockett tried to get up after being shot six times, that fact alone does not suggest a need for self-defense.

Defendant contends the trial court erred in focusing on the number of shots fired and Grockett's position on his back, because the trial court "agglomerated the mental states of all three participants in the shooting based on the acts that, reasonably, were not attributable to all three." Defendant contends that because there is insufficient evidence of who fired which shots and what their respective states of mind were, the jury may have concluded that he lacked malice, and under that scenario, he would have had an imperfect self-defense claim not shared by his coperpetrators. But the *absence of evidence* about who fired shots in what order does not constitute substantial evidence defendant actually believed he was in imminent danger.

Finally, defendant contends other circumstantial evidence supports the giving of a self-defense instruction because Grockett's body was found 20 feet from his pickup truck. If the killing had been preplanned, his body "more likely" would have been found close to the truck because it would be "more logical" for defendant, Jose Vega-Robles, and Josue Lomeli to shoot him as he emerged from the truck, or if Grockett had gotten there first, for him to wait closer to his truck. Likewise, defendant argues, the bullet holes put in Sergio R.'s blue pickup truck by Josue suggest that Grockett was between Josue and his getaway vehicle at the time of the shooting. But both of these conclusions are pure speculation and offer no support for a theory that defendant felt he

was in actual, imminent, mortal danger at the time he shot Grockett. (*Steskal*, *supra*, 11 Cal.5th at p. 345 [trial court need not give instruction based solely on speculation]; *People v. Davis* (2013) 57 Cal.4th 353, 360 [reasonable inference may not be based on suspicion, imagination, speculation, supposition, surmise, conjecture, or guesswork].) Because no substantial evidence supports a conclusion defendant possessed an actual but unreasonable belief in imminent danger of death or great bodily injury, the trial court did not err in refusing to instruct on imperfect self-defense.

In any event, we conclude any possible error was harmless under either *Chapman v. California* (1967) 386 U.S. 18, 24, or *People v. Watson* (1956) 46 Cal.2d 818, 836. "The jury's verdict finding defendant guilty of the first degree murder of [Grockett] implicitly rejected defendant's version of the events, leaving no doubt the jury would have returned the same verdict had it been instructed regarding imperfect self-defense." (*Manriquez*, *supra*, 37 Cal.4th at p. 582.) In determining that the murder was willful, deliberate, and premeditated, the jury necessarily found that defendant carefully weighed his decision to kill Grockett, a finding inconsistent with defendant having an actual but unreasonable belief that he needed to kill to defend himself. The jury also found true the allegation that the murder was committed for the benefit of a criminal street gang, with the specific intent to promote, further, and assist in the gang members' criminal conduct, a finding at odds with a notion defendant killed Grockett because he feared for his life. Thus, even if we assume the failure to instruct on imperfect self-defense violated his constitutional rights, the error was harmless.

## B. Exclusion of Impeachment Evidence

Defendant contends the trial court erred by excluding specific impeachment evidence for two of the prosecution's witnesses and that he was prejudiced by the error.

### 1. Impeachment of Stacey T.

On redirect examination, Stacey T. testified that shortly after Grockett's death, defendant went to jail. While defendant was in jail, Tim Covey moved in with Stacey, and at some point, they started a romantic relationship. In 2006, when defendant was out of jail, he told Stacey he went and "shot up" Tim Covey's mother's house. During the incident, a bullet defendant fired hit defendant in the buttocks. He told Stacey a bullet must have ricocheted and hit him. He had someone remove the bullet. On recross-examination, when asked to describe how big his scar was, Stacey testified she did not know because she never looked at defendant's "butt." She denied that she made up the story.

Defense counsel sought to introduce photographs of defendant's buttocks to demonstrate that he did not have a scar. The trial court excluded the evidence. In explaining its ruling, the court said: "That whole issue was a collateral issue in this case, far removed from any of the sort of core issues or evidence in this particular case, whether [Stacey T.] was right or wrong is of no consequence, given all of the other information in the record that you have in terms of addressing her credibility. [¶] The Court's view [is that] it's a minor point. [¶] Number two, [the photographer] might say that I don't think there is a scar there. We're talking about a particular kind of injury, a bullet wound. I have no idea whether or not bullet wounds look like other scars that people are familiar with from, let's say, large laceration [*sic*] or things where stitches are placed into the skin and remain, the marks remain for

22

years and years. And I don't think a layperson can fill that gap. [¶] I think we would have to have one or more experts examine these photographs and/or [defendant] to definitely say whether or not he does or doesn't have possibly a scar from a bullet injury. [¶] And so it's . . . the subject of expert testimony, not lay testimony, and I also don't believe that the jury is in any greater position in the absence of there being any dermatologist or trained physicians on the jury to make any assessment as to whether or not those photographs display that sort of injury, either particularly given the length of time between when the incident happened and the taking of photographs, which is well over [10] years."

The trial court denied defendant's motion to strike Stacey T.'s testimony, ruling that mistakes in witness testimony are not uncommon and that "[i]n my view, whether or not she's correct on that point has nothing to do with her overall credibility as a witness on the charged matters." The court elaborated that "[t]o the extent that counsel raises in their closing argument whether or not her testimony hinges on whether or not [defendant] has a scar on his derriere, it just seems to me that is nitpicking to the [nth] degree. It's just not even close to being important or significant in this case. So that's the reason why I'm excluding it."

Defendant argues the trial court erred in excluding the impeachment evidence because Stacey T. presented herself as a "reformed" woman, who may have told lies in the past, but was telling the truth now. Defendant asserts, to the extent the defense confronted Stacey T. with evidence regarding false statements she had made in the past, Stacey could simply point to the fact that she was a changed woman. But physical evidence that she was still lying (i.e., that defendant had no scar from a bullet removal) would make her much less believable.

"We review a trial court's decision to exclude evidence for abuse of discretion." (*People v. Peoples* (2016) 62 Cal.4th 718, 745.) "The decision to exclude evidence 'will not be disturbed except on a showing [that] the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*Ibid.*)

Defendant argues we should review the trial court's decision de novo because it did not base its decision on Evidence Code section 352, but stated the evidence was being excluded because it was a "collateral issue."[12] Defendant contends this was an error of law because under Evidence Code section 780, evidence on a collateral matter may be relevant and admissible to impeach a witness's credibility. Evidence Code section 780, however, does not *mandate* the admissibility of evidence of collateral matters for impeachment purposes. (*People v. Thornton* (2007) 41 Cal.4th 391, 428.) As with all relevant evidence, the trial court has discretion to admit or exclude such evidence. (Evid. Code, § 352; *Thornton*, at p. 428; *People v. Rodriguez* (1999) 20 Cal.4th 1, 9.)

The trial court did not abuse its discretion by refusing to admit photographs of defendant's buttocks. " '[T]he latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in individual cases is broad. The statute empowers courts to prevent criminal trials from

---

[12] Defendant argues "[t]here was no mention of Evidence Code section 352, weighing, prejudice, or probative value by the trial court or either party." It is well established, however, that a court making a ruling under Evidence Code section 352 need not expressly state it is weighing probative value against prejudice (or even state it has done so). (See *People v. Williams* (1997) 16 Cal.4th 153, 213; *People v. Ayala* (2000) 23 Cal.4th 225, 301 [trial court "[i]mplicitly" ruled that evidence would " 'mislead[ ] the jury' " under Evid. Code, § 352, because it would be confusing to appear to place witness on trial with side issues regarding credibility].)

degenerating into nitpicking wars of attrition over collateral credibility issues.' " (*People v. Ayala, supra*, 23 Cal.4th at p. 301.) Here, the trial court reasonably determined that any evaluation whether or not defendant had scarring consistent with a 10-year-old bullet wound would likely require expert testimony and result in a mini-trial on a collateral issue ostensibly related to Stacey T.'s credibility. Moreover, the relevance of such evidence was minimal, as Stacey testified only that defendant told her this story and she never actually saw the wound on defendant's buttocks. She thus had no personal knowledge whether he was injured. Considering the minimal probative value of the evidence and the likelihood it would mislead the jury and waste time, the trial court did not abuse its discretion.

We also reject defendant's claim that the exclusion of the Stacey T. impeachment evidence violated his constitutional rights. The "routine application of provisions of the state Evidence Code law does not implicate a criminal defendant's constitutional rights." (*People v. Jones* (2013) 57 Cal.4th 899, 957.) Because the trial court appropriately exercised its discretion to exclude the photographs of defendant's buttocks, defendant's constitutional claim fails.

### 2. *Impeachment of Jamie B.*

Defendant next contends the trial court's exclusion of a statement by Jamie B. regarding a different murder case was error.

During trial, evidence was entered regarding Stacey T.'s role in the attempted shooting of Thomas "Bubba" Covey by FAIM member Joe Verducci in January 2007. Bubba had been dating Stacey's sister, but the relationship soured. Bubba had beaten Stacey's sister "a lot," and threatened to bash her one-year-old son's head in with a bat. Defendant helped the sister move out of Bubba's house, which created a separation between defendant and Bubba.

In January 2007, Bubba was making threatening calls to Stacey T.'s sister from a bar near Stacey's house. Defendant called Stacey T. on the phone from jail. When Stacey told defendant about Bubba's calls, defendant told her to contact Verducci and tell him that he should handle it. Stacey relayed the message to Verducci. Stacey testified she regretted doing that, and that when she called Verducci to give him defendant's message, she knew she was passing an instruction to have Bubba hurt. Verducci and Stacey's brother went to the bar, where Verducci shot and killed a bystander.[13]

Jamie B. testified that she "believe[d]" she was at Stacey T.'s apartment on the night Verducci killed someone. During a break in her testimony, defense counsel sought to introduce a statement Jamie made to law enforcement that defendant was also at Stacey T.'s apartment that night, though defendant was in jail at the time. Defense counsel argued the statement was relevant to show that Jamie B. "was confabulating." Although counsel said he would not "call it lying, she was relating events as fact, in terms of a murder case that were totally absurd."

The trial court excluded the statement, noting that ample evidence had been provided the jury to allow them to assess Jamie B.'s credibility, including a similar type of statement that had just come out in Jamie B.'s testimony as to whether defendant was present at The Dead Fish on the night of the Grockett murder. The court also observed that there had already been "three or four trials" of the Verducci murder case, and "[w]hether or not [Jamie B. had] been entirely consistent with regard to every fact relating to that trial" was "extraneous" to this case. The court expressly ruled that

---

[13] At the time of this trial, Verducci was in prison for that killing.

26

"[u]nder [Evidence Code section] 352, it's a collateral matter that doesn't relate to this case and it doesn't have much to do with her credibility in this case." Rejecting the prospect of having to call various witnesses to establish Jamie B.'s recollection was false, the trial court remarked that such impeachment would in effect be "trying the Verducci case."

Defendant contends the trial court erred because it failed to consider whether the presentation of this evidence, which would require three or four questions at the most, would involve an undue consumption of time, confuse the issues, or mislead the jury. Because Jamie B. was the only witness who testified there was a plan to murder Grockett, defendant argues the value of the impeachment evidence was "great."

As discussed above, we review a trial court's decision to exclude evidence under Evidence Code section 352 for abuse of discretion. (*People v. Peoples*, *supra*, 62 Cal.4th at p. 745.) Here, the trial court appropriately considered that the jury already had ample evidence relating to Jamie B.'s credibility. The jury had also just heard similar impeachment evidence regarding Jamie B.'s recollection that defendant was not at The Dead Fish on the night of the Grockett murder—evidence which, unlike the Verducci evidence, related directly to this case. Evidence regarding defendant's physical presence at Stacey T.'s apartment on the night of the Verducci killing had minor probative value and exploring the source of Jamie B.'s confusion on that issue would have added even more unnecessary complexity to this already complicated trial. The trial court did not err in excluding the evidence. We likewise reject defendant's argument that the exclusion of the Jamie B. impeachment evidence violated his federal constitutional rights. (See *People v. Jones*, *supra*, 57 Cal.4th at p. 957.)

## C. *Dissuading a Witness Counts*

In counts two and three, defendant was charged with, respectively, dissuading a witness, Ralph N., by force or threat (§ 136.1, subd. (c)(1)), and dissuading a witness, Ralph N., in furtherance of a conspiracy (*id.*, subd. (c)(2)).  Both counts required that defendant prevent or dissuade a witness from testifying or attempt to do so.[14]  Defendant contends insufficient evidence supports his convictions and raises several claims of instructional error with respect to counts two and three.

### 1. *Sufficiency of the Evidence*

Defendant first contends the evidence presented at trial was insufficient to support his convictions on counts two and three.  He argues although evidence was introduced that he was *preparing* to dissuade Ralph N. from testifying, there was no evidence that he *attempted* to do so.

" 'In reviewing a sufficiency of the evidence challenge, we view the evidence in the light most favorable to the verdict and determine whether *any* rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " (*People v. Davis*, *supra*, 57 Cal.4th at p. 357.)

---

[14] Section 136.1, subdivision (c) states in relevant part:  "Every person doing any of the acts described in subdivision (a) or (b) knowingly and maliciously under any one or more of the following circumstances, is guilty of a felony punishable by imprisonment in the state prison for two, three, or four years under any of the following circumstances: [¶] (1) Where the act is accompanied by force or by an express or implied threat of force or violence, upon a witness or victim or any third person or the property of any victim, witness, or any third person. [¶] (2) Where the act is in furtherance of a conspiracy."  Subdivision (a) proscribes "prevent[ing] or dissuad[ing]" or "attempt[ing] to prevent or dissuade[,] any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law." (§ 136.1, subd. (a).)

Preparation and planning for a crime alone are insufficient to establish guilt for the attempted commission of the crime. " 'It is settled that an attempt to commit a crime is compounded of two elements, viz., intent and a direct ineffectual act done toward its commission.' " (*People v. Memro* (1985) 38 Cal.3d 658, 698 (*Memro*), overruled on other grounds in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2.) " '[T]here is a material difference between the preparation antecedent to an offense and the actual attempt to commit it. The preparation consists of devising or arranging the means or measures necessary for the commission of the offense, while the attempt is the direct movement toward its commission after the preparations are made. . . .' [Citations.] [¶] . . . [A]n attempt, as distinguished from acts preparatory to that offense, requires 'some appreciable fragment of the crime [be] accomplished.' " (*Memro*, at p. 698.) "When a defendant acts with the requisite specific intent, that is, with the intent to engage in the conduct and/or bring about the consequences proscribed by the attempted crime [citation], and performs an act that 'go[es] beyond mere preparation . . . and . . . show[s] that the perpetrator is putting his or her plan into action' [citation], the defendant may be convicted of criminal attempt." (*People v. Toledo* (2001) 26 Cal.4th 221, 230.)

"As simple as it is to state the terminology for the law of attempt, it is not always clear in practice how to apply it. As other courts have observed, ' "[m]uch ink has been spilt in an attempt to arrive at a satisfactory standard for telling where preparation ends and attempt begins." ' " (*People v. Superior Court (Decker)* (2007) 41 Cal.4th 1, 8.) "Although a definitive test has proved elusive," our Supreme Court has "long recognized that '[w]henever the design of a person to commit crime is clearly shown, slight acts in furtherance of the design will constitute an attempt.' " (*Ibid.*; *People v. Dillon*

29

(1983) 34 Cal.3d 441, 455 ["the plainer the intent to commit the offense, the more likely that steps in the early stages of the commission of the crime will satisfy the overt act requirement"].)

As defendant apparently concedes, his statement to Deputy Arnaudo that "that's how paperwork gets out" was substantial evidence of his intent to dissuade Ralph N. from testifying. Thus, the only question before us is whether the evidence was sufficient to convince the jury that slight acts in furtherance of defendant's design had occurred. In addressing a challenge to the sufficiency of the evidence, we "must examine the whole record in the light most favorable to the judgment" and "presume[ ] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)

Upon our review of the record, we conclude sufficient evidence supports defendant's convictions on counts two and three. Arnaudo had defendant open the suspicious "legal mail" envelope in front of her and saw a confidential document from the California Department of Corrections and Rehabilitation with Ralph N.'s photograph among the papers inside. When she asked defendant why his attorney was sending him information about another inmate, defendant told her he was having his attorney make copies because "that's how paperwork gets out." The parties stipulated that the attorney listed on the return address was not defendant's attorney. From Arnaudo's testimony, the jury could reasonably infer that defendant had access to Ralph N.'s debriefing report, and had taken steps to distribute it by having copies made outside of jail by someone who was not his attorney. This evidence, combined with the clear evidence of defendant's intent to distribute the debriefing report, sufficed to show he was making a direct movement toward commission of the offense.

Arnaudo also testified that she understood "paperwork" to be damaging information on a person, and she confiscated the papers to protect Ralph N. Correctional Officer Perryman testified that if copies of Ralph's debriefing document were being made and sent out, it could be dangerous for him and his family, and that if paperwork got out, it could also encourage a person to change their testimony. The jury heard extensive evidence about Ralph's inconsistent testimony in prior trials and hearings. They also heard him testify in person at this trial that he did not know defendant or Grockett and heard him deny that defendant told Ralph he killed Grockett. Collectively, this evidence supported the prosecution theory that defendant attempted to dissuade Ralph N. from testifying against defendant.

Relying heavily on *People v. Luna* (2009) 170 Cal.App.4th 535, defendant argues the evidence in this case shows at most *preparation*, and not an actual attempt to dissuade Ralph N. from testifying. In *Luna*, the defendant was convicted of attempting to manufacture a controlled substance. A police officer had stopped the defendant's vehicle in a traffic stop, and after a consensual search, discovered all of the equipment necessary to manufacture concentrated cannabis, or hashish. (*Id.* at pp. 537–538.) The only thing missing was a sufficient quantity of marijuana to begin manufacturing, though the defendant had $1,200 in cash he could use to purchase marijuana. The defendant testified at trial, admitting he purchased the equipment with intent to manufacture hashish. (*Id.* at pp. 538–539.) Reasoning that the defendant had not assembled the manufacturing device and had yet to obtain a sufficient quantity of marijuana to begin manufacturing, the appellate court concluded the evidence was insufficient to show attempt because it revealed only that the defendant was "engaged in preparatory acts" and there was "a complete

inability to take even initial steps toward producing the finished product." (*Id*. at p. 543.)

Here, by contrast, defendant was not missing anything he needed to take steps toward dissuading Ralph N. from testifying. Though defendant contends he "was caught while obtaining or arranging the means for the commission of the crime," his statements to Arnaudo support an inference he or his associates already had access to a copy of Ralph N.'s debriefing report, and defendant told her he was having copies made because "that's how paperwork gets out." Several witnesses testified to the danger for an inmate in having their debriefing "paperwork" distributed. As our Supreme Court has emphasized, " '[w]henever the design of a person to commit a crime is clearly shown, slight acts done in furtherance of that design will constitute an attempt, and the courts should not destroy the practical and common-sense administration of the law with subtleties as to what constitutes preparation and what constitutes an act done toward the commission of the crime.' " (*Memro*, *supra*, 38 Cal.3d at p. 698.) Construing the evidence, as we must, in the light most favorable to the verdict, we conclude sufficient evidence supported defendant's convictions for attempting to dissuade and conspiracy to dissuade a witness.

### 2. *Jury Instructions*

Defendant raises three claims of instructional error with regard to the dissuading a witness counts. We address each in turn.

#### a. *CALCRIM No. 2622*

As noted, section 136.1 applies to any person who "[k]nowingly and maliciously *attempts* to prevent or dissuade any witness or victim from attending or giving testimony at any trial." (§ 136.1, subd. (a)(2), italics added.) The jury was instructed with a modified version of CALCRIM

No. 2622, quoted in relevant part, as follows: "The defendant is charged in Count Two with Intimidating a Witness in violation of Penal Code section 136.1[, subdivision] (c)(1). [¶] To prove that the defendant is guilty of this crime, the People must prove beyond a reasonable doubt that: [¶] 1. The defendant maliciously *tried* to prevent or discourage Ralph [N.] from giving testimony at trial in the case of People v. Coby Phillips." (Italics added.) As already discussed, an attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act toward its commission. (§ 21a.) Defendant argues the jury instruction inappropriately substituted the word "tried" for "attempted" and that the jury was not instructed on the elements of attempt as they relate to counts two and three. Though defendant did not request such an instruction, he claims any error was not forfeited because the error affected his substantial rights.

If a trial court gives an instruction that "is potentially ambiguous or misleading, the instruction is not reversible error unless there is a reasonable likelihood that the jurors misunderstood or misapplied the pertinent instruction." (*People v. Iboa* (2012) 207 Cal.App.4th 111, 121; *People v. Avena* (1996) 13 Cal.4th 394, 416–417.) Here, there is no reasonable likelihood that the jury misunderstood or misapplied CALCRIM No. 2622. The common understanding of the word "tried" is the equivalent of "attempted" and denotes an effort designed to achieve a goal. (See *People v. Cain* (1995) 10 Cal.4th 1, 44.) Preparation, in common understanding, does not qualify as trying or attempting. Thus, there was no realistic danger that the jury understood it only had to find defendant was preparing to commit the crime of witness dissuasion as opposed to taking initial steps to accomplish the crime.

Nor are we persuaded that the failure to instruct on the elements of attempt constitutes reversible error. A trial court's failure to instruct on all elements of an offense is not reversible error under the federal Constitution if it was harmless beyond a reasonable doubt. (*People v. Bell* (2009) 179 Cal.App.4th 428, 439.) In *People v. Cain*, our Supreme Court considered whether the trial court's failure to instruct on the elements of attempt with respect to an attempted rape special circumstance constituted reversible error. The high court concluded that the jury instruction on attempt "merely restates the common meaning of 'attempt,' " which is "to 'try' or 'endeavor to do or perform' the act." (*People v. Cain*, *supra*, 10 Cal.4th at p. 44; see *People v. Lynch* (2010) 50 Cal.4th 693, 763, overruled on other grounds by *People v. McKinnon* (2011) 52 Cal.4th 610, 636–638 [following *Cain* court's analytical approach in finding harmless error for failing to instruct on elements of attempt].) Here, as in *Cain* and *Lynch,* the jury could not have found defendant "tried" to dissuade Ralph N. unless they found he both intended to do so and committed an act toward the commission. Thus, in finding him guilty of witness dissuasion, the jury necessarily considered and found true the elements of attempt. Moreover, defendant's incriminating statement to Arnaudo about having copies made in order to get paperwork out, the expert testimony about what it means to distribute paperwork, and Ralph N.'s starkly inconsistent testimony evidenced, at a minimum, defendant's clear intent to intimidate Ralph N. and his initial steps toward the crime. Thus, any presumed error in failing to instruct the jury on the elements of attempt was harmless beyond a reasonable doubt.

### b. Failure to Instruct with CALCRIM No. 2623

Defendant was charged in count two with, and found guilty of, dissuading a witness *by force or threat* under section 136.1, subdivision (c)(1).

Section 136.1, subdivision (c)(1) requires the jury to find the defendant's "act is accompanied by force or by an express or implied threat of force or violence." CALCRIM No. 2623 applies to violations of section 136.1, subdivision (c). The jury here, however, was instructed with CALCRIM No. 2622, which did not require them to find the element of force or threat.

The Attorney General concedes the trial court erred in failing to instruct on force or threat, but contends the error is harmless beyond a reasonable doubt because it is clear from the record that defendant's scheme to dissuade Ralph N. from testifying involved either employing fear stemming from the threat of force, or inciting a third party to kill Ralph N.

The record here is not so clear, however. While Ralph N. testified generally that gang members could harm a dropout based on information in a debriefing report, he also testified that nothing would happen to him because he is a "has been" that had been out of the gang for 10 years. When asked about what it would mean to have "paperwork" circulating, Ralph testified it would be a problem if one were "going back to the dope game," but if "you are going back to live a normal life then who cares." The defense elicited on cross-examination that it was already known among AB and NLR gang members in 2009 that Ralph was a dropout. In closing argument, the prosecutor argued Ralph N. was "annoyed" by the distribution of his debriefing report, that it was "problematic" for him, and told the jury that "[e]ven if [Ralph] was not intimidated by the idea of his debriefing being out in public, even when he's out of prison like he is now, and perhaps fair game on the street for some people, even if that doesn't intimidate him, that's not a defense for the defendant."

On this record, it is not clear beyond a reasonable doubt what the jury might have decided if instructed under CALCRIM No. 2623 that the

attempted threat must be accompanied by force or a threat of force or violence. The Attorney General asserts, and we agree, that the remedy for this error is to modify the judgment to reduce defendant's conviction on count two to a violation of section 136.1, subdivision (a)(1). (See *People v. Torres* (2011) 198 Cal.App.4th 1131, 1149.)

### c. *Instruction on Conspiracy to Dissuade a Witness*

Defendant next argues the court erroneously instructed the jury on count three, dissuading a witness from testifying in furtherance of a conspiracy under section 136.1, subdivision (c)(2), because the court failed to instruct the jury that it had to find defendant committed an act described in subdivision (a) or (b) of section 136.1. Instead, the court instructed the jury with a modified form of CALCRIM No. 415, the instruction on conspiracy under section 182. Defendant contends the instruction given at trial omitted an element of the offense and constituted reversible error.

We conclude the error was harmless beyond a reasonable doubt. In this argument, defendant complains only that the jury was not required to find that defendant attempted to dissuade Ralph N. under section 136.1, subdivision (a). But the jury necessarily had to make such a finding in its guilty verdict on count two. Under these circumstances, and for the reasons already discussed, any error was harmless beyond a reasonable doubt.

## D. *Review of Sealed Records*

The trial court reviewed in camera numerous documents that had been subpoenaed by the defense and ordered the documents and reporter's transcripts of the in camera review proceedings sealed. Defendant asked us to review the record of the in camera proceedings to determine whether the court erroneously failed to provide discovery the defense should have received.

Defendant requested we review four categories of documents that had been subpoenaed, including documents from the California Bureau of Narcotic Enforcement, Richmond Police Department, Contra Costa County Sheriff's Office, and Sergio R.'s immigration records. On December 7, 2018, one week prior to filing his opening brief, defendant requested augmentation of the record with all of the records placed under seal by the trial court. We granted the request on December 13, and the clerk of the superior court transmitted documents under seal to this court on January 17, 2019.

Upon our initial review of the documents forwarded to us and the trial court's orders sealing those documents, it became clear that we did not have all of the records placed under seal by the trial court. As to the Contra Costa County Sheriff's Office records, the trial court had placed under seal in 2016, a "thumb drive" containing an Excel spreadsheet, but we received only an electronic PDF file (not a "thumb drive") that may have been an imaged copy of an Excel file but which cut text off from various cells throughout the document. With regard to the Richmond Police Department records, the trial court had likewise placed records on a "Flashdrive"[15] under seal in 2016, but we received six volumes of PDF files. Our comparison of the trial court's 2016 order describing the records it had reviewed with the documents transmitted by the superior court clerk made clear that we had only some of the documents the superior court had reviewed in 2016. When we asked the trial court to provide the original thumb drives it had placed under seal, we were informed they could not be located.

---

[15] Although the trial court described the electronic media on which the Contra Costa County Sheriff's Office and Richmond Police Department records were placed as "thumb drive" and "Flashdrive" alternatively, we refer to them collectively as "thumb drives."

On November 7, 2019, we asked the parties to provide supplemental briefing within two weeks addressing how the court should proceed. After reviewing the supplemental briefing, on December 20, we asked the trial court to attempt to obtain the records from the custodian of records for the Richmond Police Department and Contra Costa County Sheriff. We also asked the trial court to review any records it received, confirm whether they were the records that had been produced in 2016, and transmit all documents it previously reviewed under seal to this court. As to the Contra Costa County Sheriff's records, the sheriff's office was able to locate a duplicate copy of the records originally provided to the trial court in 2016, and those records were transmitted under seal and received by this court on February 27, 2020.

As to the Richmond Police Department records, a duplicate copy of the records the trial court reviewed in 2016 could not be located. Based on our request and at the direction of the trial court, however, the custodian of records for the Richmond Police Department searched for and located all of the documents it could find that were responsive to the original subpoena. The trial court then transmitted copies of those records to us on February 10 and March 13, 2020, along with a report indicating that the trial court was "certain" the records were not an exact duplicate of the records submitted by the Richmond Police Department in 2016.

After receiving both sets of records, we issued a further order on May 22, 2020 asking the trial court to review the sheriff's office records and tell us whether it had ordered any of the records disclosed to defense counsel and, if so, which records were disclosed. As to the Richmond Police Department records, we requested that the trial court review the records and, to the best of its ability, determine which records had previously been provided to the trial court, which records had been disclosed to the defense,

and which records had not been submitted to the court in 2016. The trial court held four hearings, in February, June, August, and October 2020, during which it obtained assistance from the parties, including defendant's trial counsel, in an effort to reconstruct and settle the record. We augmented the record, on December 9, 2020, with copies of transcripts from the hearings and have reviewed the trial court's reports on its findings.

After the proceedings in the trial court to resolve the record deficiencies had concluded, on January 29, 2021, defendant requested the opportunity to file a second supplemental brief to address issues that arose during those proceedings. We granted the request on February 18, and set a briefing schedule. Defendant filed a second supplemental brief raising several issues regarding the Contra Costa County Sheriff's Office records, which we address below. The Attorney General filed a second supplemental opposition brief, and defendant filed a reply.

Having now completed our review of the documents that defendant requested we review, we conclude the trial court did not err.

### 1. Bureau of Narcotic Enforcement Records

Defendant subpoenaed records from the California Bureau of Narcotic Enforcement (BNE) regarding Sergio R., Grockett, and Robert Lott.[16] The Attorney General filed a motion to quash the subpoena.[17] Defendant opposed

---

[16] Part of the defense theory of the case was that Robert Lott, a drug dealer, killed Grockett because Lott was afraid after Grockett robbed him at gunpoint. The BNE conducted a wiretap investigation on Lott's telephone and intercepted multiple calls between Lott and Grockett.

[17] The BNE no longer existed at the time of defendant's subpoena, but the Attorney General indicated the Department of Justice Bureau of Investigation, Division of Law Enforcement "may have BNE's records in its possession, custody and control."

the motion, arguing that the BNE records were central to the case because it was a BNE agent, Michael Fanucchi, who first told Detective Pate about the possibility of Lott's involvement in the Grockett murder. Fanucchi gave Pate information about Grockett from wiretaps of Lott's phone. Fanucchi had also previously testified about a video seized from a search of the home of Richard Folla, a neighbor of Lott's, in which Fanucchi thought he remembered seeing an individual in a mask pointing at the Cummings Skyway freeway off-ramp, which led to the location of Grockett's death.[18] In his opposition to the motion to quash, defendant asked the trial court to review the BNE records for material discoverable under section 1054 and *Brady v. Maryland* (1963) 373 U.S. 83. After an in camera review, the trial court ordered some of the records disclosed to the defense and placed the rest under seal.

We have reviewed the BNE records and we conclude the trial court did not err in refusing to order additional documents disclosed.

### 2. Richmond Police Department Records

Defendant subpoenaed records from the Richmond Police Department relating to Michael Wang, a City of Richmond police officer. Sergio R. testified Wang accepted bribes from Sergio R. in exchange for information and protection. The defense theorized that Sergio was an informant in both the Wang investigation and defendant's case, and that Sergio's informant agreement and disclosures in both cases were intertwined. Defendant sought impeachment evidence and evidence of Sergio's work as an informant.

---

[18] Fanucchi testified in this trial that he was mistaken about Cummings Skyway because apparently the video was of a location in Marin County. He also testified he was mistaken in his prior testimony about how the video came into the possession of law enforcement.

The trial court reviewed the Richmond Police Department records in camera and issued a detailed 10-page order describing the records it had reviewed, which records would be disclosed, and which records were not ordered disclosed.

We have reviewed the records as reconstructed and settled by the parties and the trial court in the proceedings described above. Upon our review, we conclude the trial court did not err in failing to order additional documents be provided to the defense.

### 3. Contra Costa County Jail Records

#### a. Additional Background

Defendant subpoenaed records from the Contra Costa County Sheriff's Office seeking classification and disciplinary records of various inmates including, among others, Ralph N., Sergio R., Jose Vega-Robles, and Ronnie Yandell. The sheriff's office sent defense counsel a letter objecting to the subpoena, and shortly thereafter, defense counsel requested issuance of an order to show cause based on the county's failure to file a motion to quash or produce documents. The trial court issued an order to show cause, county counsel filed a response to the order, and the trial court subsequently conducted a review of documents produced in camera.

On August 30, 2016, the trial court filed an order discussing its in camera review of the records. The court observed that the "records provided by the Sheriff's Office purport to be 'Chron' files regarding the following inmates: J. Vega-Robles, S[ergio R.], R. Yandell, T. Makanski, J. Soletti, [Ralph N.], and E. Stiverson." The court noted the records were contained on a black "thumb drive" and "were in Excel Spreadsheet format and it was not always clear whether the columns of entries were consistent with corresponding date entries contained in a separate columns [*sic*] of dates

41

which purported to reflect when the 'chron' entries were actually made." The court went on to state: "Having reviewed the records, the court has decided to disclose a limited number of entries. Each entry to be disclosed will be in a three page format. The first page reflects the person to whom the entry relates; the second page the actual 'chron' entry; and the third page the dates corresponding to the date of the event [c]aptured by the described event." The court explained copies of the entries to be disclosed would first be provided to the records custodian so the sheriff's office could have an opportunity to file any additional objection to the disclosure of the records. If an objection was filed, the court would set a date for hearing on the objection. The court also stated defendant would be required to sign a confidentiality "pledge/undertaking" with respect to the records.

In September 2016, Contra Costa County Counsel requested an in camera hearing regarding the proposed disclosure, and the sheriff's office filed a declaration from a sergeant regarding specific concerns with release of portions of three inmates' classification records. On September 22, the trial court stated it had reviewed some of the records and found some to be discoverable. County counsel again requested an in camera hearing. On October 5, the court held an in camera hearing. The trial court stated on the record after the hearing it had discussed release of certain records with the sheriff's office, but more time was needed before disclosure.

During opening statements on October 7, outside the presence of the jury, the trial court noted it held an in camera proceeding "the other day" regarding information that might be turned over "in its current form or some alternative form." The court noted one of the individuals for whom jail records were sought might testify, and advised the prosecution to inform county counsel "[b]ecause [the court would] turn what [it had] over to

42

[defense counsel] no later than when that person first hits the witness stand." On October 20, during trial, the trial court stated on the record that it had provided subpoenaed records to counsel relating to E. Stiverson. Defense counsel did not contradict that statement.

In the course of record settlement proceedings in this appeal, on October 13, 2020, the trial court issued an order, to which defendant's trial counsel and the district attorney stipulated, stating the following: "Trial counsel for [defendant] has indicated in his submissions to this court that he had available to him during the trial various relevant Contra Costa jail records. However, based on the information currently available to this court and counsel, this court and the parties cannot confirm that any of the specific records or entries from records of the Contra Costa Sheriff contained in the [thumb drive] submitted to the First District Court of Appeal[ ] on February 13, 2020 were disclosed to the defense pursuant to this court's order on August 30, 2016 notwithstanding the fact that at page two of that order this court indicated that certain of these records were to be ordered disclosed at that time."[19]

As noted above, defendant filed a second supplemental brief in this court, raising several issues regarding the sheriff's office records.

### b. *Adequacy of the Record on Appeal*

Defendant raises several challenges to what he characterizes as the adequacy of the record on appeal. First, he argues the record is inadequate

---

[19] The trial court's August 30, 2016 order stated "the court has decided to disclose a limited number of entries," but indicated that "[c]opies of the entries to be disclosed" would first be disclosed to the sheriff's office to give them a chance to object. The order noted, "If no objection is filed, the records shall be disclosed forthwith. If an objection is filed, the court will set a date for a hearing on the objection."

because the trial court was unable to identify which documents it disclosed to trial counsel. Defendant also argues the trial court failed to ascertain that the sheriff's office had submitted all documents responsive to the subpoena because he subpoenaed a greater number and type of records than were provided. In addition, he argues, the record is inadequate because the trial court could not confirm it disclosed a certain entry showing that **[REDACTED]**.[20] Accordingly, defendant contends, we cannot review the record to determine if he was erroneously denied information that would assist in his defense.

"A criminal defendant is entitled under the Eighth and Fourteenth Amendments to an appellate record that is adequate to permit meaningful review." (*People v. Young* (2005) 34 Cal.4th 1149, 1170.) Defendant bears the burden of demonstrating the record is inadequate. (*Ibid.*)

We first address defendant's concern with the trial court's inability to definitively state which records were disclosed in 2016. In doing so, we are mindful we must presume the correctness of the judgment, and it is defendant's responsibility to affirmatively demonstrate reversible error. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609.) Here, the record reflects the trial court decided in 2016 it would disclose certain records from the "chron" files of seven inmates. As to some of them, the sheriff's office filed objections, and the trial court held an in camera hearing with county counsel and the custodian of records for the sheriff's office. After the in camera hearing, the court indicated "there will be some disclosures made," but the sheriff's office needed additional time to "look into certain matters relating to the items [the

---

[20] During the record reconstruction and settlement proceedings, the trial court allowed counsel access to certain of the sheriff's office records subject to a protective order.

trial court] identified" for disclosure. The trial court then stated, "[I]t's going to be at least a short while longer before any of those disclosures are made to you," but the court anticipated making "at least some disclosures from that subpoena made to [defense counsel] of records relating to particular individuals." Later, during trial, the trial court stated it had provided subpoenaed records to counsel relating to E. Stiverson. Moreover, in the record reconstruction and settlement proceedings, defendant's trial counsel explained that he received confidential sheriff's office records during trial but "used them and gave them back" because a "young man . . . from the law department" wanted them back. To the extent defendant did not receive records the court indicated it was planning to disclose, it was defense counsel's responsibility to follow up and obtain a ruling. We will not presume error on a silent record.

As to the trial court's failure to ascertain whether the sheriff's office had produced all records responsive to the subpoena, we likewise conclude defendant has failed to demonstrate error. Defendant complains that he subpoenaed a greater number and type of records than were provided by the sheriff's office. Defendant's claim is premised on his assertion that he does not know what was presented to the trial court in camera, but to the contrary, the trial court described the documents it was reviewing in camera. The trial court stated the records were " 'chron' " files for seven inmates in "Excel Spreadsheet format," indicating they consisted of three pages each—a cover sheet with information on the inmate, the chron entry, and the dates corresponding to the event described. Defendant complains that the sheriff's office filed a declaration stating it had 1,700 pages of responsive incident reports, including specific numbers of booking reports and incident reports for several of the inmates. But defendant knew that information at trial, and

points to no evidence he followed up in pursuit of those records with the trial court.  (See, e.g., *People v. Morrison* (2004) 34 Cal.4th 698, 714; *People v. Valdez* (2012) 55 Cal.4th 82, 121 ["it appears defendant has forfeited this issue by failing to object and obtain a ruling in the trial court"].)

Defendant further contends the record is inadequate for a meaningful appeal because the trial court could not confirm whether it disclosed one of the entries in **[REDACTED]**.  As discussed above, however, defendant has failed to demonstrate the trial court erred because the trial court indicated it was intending to disclose certain of the "chron" files and defendant has not shown that the records were not disclosed or that he followed up to obtain them.

In any event, defendant has failed to demonstrate prejudice.

**[REDACTED.]**

Defendant also argues he should be given the "benefit of the doubt" as to the adequacy of the appellate record because the trial court was unable to settle the record.  But the only portion of the record that went missing was the thumb drive with the Contra Costa County Sheriff's Office documents on it, and a duplicate was recovered during the proceedings below.  Accordingly, defendant has failed to demonstrate that any deficiency from a missing or inadequately reconstructed portion of the record caused him prejudice or prevented him from pursuing a meaningful appeal.

### c.  Allegedly Missing Records

Defendant also argues that the "chron" file for Sergio R. appears to be incomplete because the record appears not to cover the entire time he was housed in the Contra Costa County jail.  Defendant **[REDACTED]** asks us to conclude the Contra Costa County Sheriff's Office failed to provide complete chron records for Sergio R. to the trial court.

46

As discussed above, defendant bears the burden to demonstrate the record is inadequate to prosecute his appeal. His argument that portions of Sergio's chron record were missing is based on speculation about what the record should have shown. (*People v. Young, supra,* 34 Cal.4th at p. 1170.) Because we must presume the judgment is correct, we decline to assume error in the absence of an affirmative showing.

We have reviewed the documents sealed by the trial court and the transcript of the in camera proceeding. Based on our review of those records, the trial court's orders, and the reporter's transcript in this appeal, we conclude the trial court did not err in refusing to disclose records.

### 4. Sergio R.'s Immigration Records

Sergio R. testified that, as part of the benefits package he received in exchange for his testimony, he was to receive assistance with obtaining legal resident status in the United States. He testified he did not know his immigration status, and that confidential documents had been filed in his immigration case. The prosecutor had earlier disclosed that he had written letters on Sergio's behalf to avoid his deportation and ensure he was available to testify.

In October 2016, Sergio's immigration attorney brought his file to court and the trial court reviewed his immigration records in camera. The trial court ordered the records and the transcript of the in camera hearing sealed.

We have reviewed the records and we conclude the trial court did not err in refusing to order any documents disclosed.

### E. Ineffective Assistance of Counsel

Defendant argues his trial counsel rendered ineffective assistance of counsel by failing to object to prosecutorial misconduct in opening statements and closing argument. Defendant claims each of his arguments may be

reviewed on the appellate record alone because counsel's performance was so deficient, there simply could be no satisfactory explanation for the failure to act.

### 1. *Legal Standard*

To succeed on an ineffective assistance of counsel claim, a defendant must show (1) counsel provided representation that fell below an objective standard of reasonableness under prevailing professional norms and (2) prejudice resulted from counsel's deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 691–692; *People v. Jennings* (1991) 53 Cal.3d 334, 357.) A defendant shows prejudice when there is a reasonable probability that, but for counsel's deficient representation, the result of the proceeding would have been different. (*Jennings*, at p. 357.) " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*Ibid.*; *People v. Avena*, *supra*, 13 Cal.4th at p. 418.)

When a defendant makes an ineffective assistance claim on direct appeal, and the record does not show why counsel chose to act as he or she did, the conviction must be affirmed unless there could have been no rational tactical purpose for counsel's acts or omissions. (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1007.)

### 2. *Stock Images in Opening Statement*

During opening statement, the prosecutor used generic photographs in his PowerPoint presentation, interspersed with photographs of evidence in defendant's case. Defendant argues the prosecutor never distinguished between the generic photographs and actual evidence in the case, giving the jury a misimpression about the drugs, money, and gangs involved in this case and coloring their view of all the evidence that was about to be presented. Defendant argues the images had psychological impacts on the jurors

including a "primacy effect," a "priming effect," and a "framing effect," which collectively impacted how the evidence presented at trial was viewed by the jurors.

The slides defendant finds objectionable contain images of drugs, gang members, and money. While the images may have been alarming or upsetting to some jurors, they were no more inflammatory than the evidence adduced at trial. This case involved multiple White supremacist gangs, extensive drug dealing, multiple murders and evidence of solicitation to commit murder, death threats, violence, and other provocative subjects. Given the substantial volume of incendiary evidence presented at trial, it is unlikely that the stock images presented during opening statement had a lasting and prejudicial effect on the jurors.

Moreover, the jury was instructed that statements by counsel, including remarks made in opening statements and closing arguments, are not evidence and the jury must follow the court's instruction on the law. (See *Boyde v. California* (1990) 494 U.S. 370, 384–385 [arguments of counsel carry less weight with a jury than instructions from the court]; *People v. Cunningham* (2001) 25 Cal.4th 926, 1001–1002 [prosecutor's inaccurate remarks during opening statement were harmless because jury was instructed that opening statement was not evidence and defendant had a chance to confront witnesses and challenge all evidence offered against him].) Even assuming defense counsel performed inadequately in failing to object to the opening statement, we cannot conclude defendant was prejudiced by the generic images used by the prosecution in its opening.

### 3. *Closing Argument*

Defendant raises several claims of error with respect to the prosecution's closing argument. First, he claims the prosecutor used facts not

in evidence to bolster Jamie B.'s credibility by telling the jury that he had no influence over her case when she had in fact testified that the prosecutor would inform her sentencing judge whether he thought she had testified truthfully. Second, he claims the prosecutor engaged in impermissible vouching by telling the jury that defendant's case had been investigated by the district attorney's office and he was indicted by a grand jury, thereby suggesting that the pretrial procedure could be used as evidence of defendant's guilt. Third, defendant claims that the prosecutor impermissibly implied there was evidence the jury had not heard, including statements from Clayton Cates, Thomas Covey, and Tim Covey, that exonerated Robert Lott and Tara S. and inculpated defendant. Fourth, defendant argues that the prosecutor sought to justify the plea bargains he made to obtain witness testimony by telling the jury that witnesses have to feel safe before they are willing to testify.

Considered in the context of the whole trial, the alleged errors were not significant. The prosecution's statements during closing argument about Jamie B.'s incentives to testify, the grand jury indictment and pretrial proceedings, the fleeting references to individuals that did not testify at trial, and the explanation he gave for the reason he made plea bargains with some witnesses were all very brief. (*People v. Brown* (2003) 31 Cal.4th 518, 553–554 [defendant not prejudiced by brief and fleeting remarks by prosecution]; *People v. Wharton* (1991) 53 Cal.3d 522, 567–569 [same].) Even assuming the remarks constituted misconduct, it is unlikely that the jury gave them much weight particularly because, as discussed above, the jury was clearly instructed that statements by counsel are not evidence. On this record, defendant has not demonstrated a reasonable probability that but for his

counsel's alleged ineffective assistance he would have received a different result.

## F. Cumulative Error

Defendant contends the cumulative errors in this case warrant reversal because they deprived him of his federal constitutional right to a fair trial.

Under the "cumulative error" doctrine, we reverse the judgment if it is " 'reasonably probable' " that the jury would have reached a result more favorable to the defendant absent a combination of errors. (See *People v. Williams* (2009) 170 Cal.App.4th 587, 646.) "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' " (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

Apart from the failure to instruct on the element of force or threat with respect to count two, we have found either no error or the presumed error was harmless under the appropriate standard of review. Taking all of defendant's claims into account, we conclude there was no cumulative error that rendered his trial unfair.

## G. Discretion on Sentence Enhancements

### 1. Firearm Enhancement

The trial court sentenced defendant to a term of 25 years to life on a firearm enhancement under section 12022.53, subdivisions (d) and (e)(1), as it was statutorily required to do at the time of defendant's sentencing. (§ 12022.53, former subd. (h); Stats. 2010, ch. 711, § 5.) Effective January 1, 2018, Senate Bill No. 620 (2017–2018 Reg. Sess.) (Senate Bill 620) amended section 12022.53, subdivision (h) to empower the trial court "in the interest of justice pursuant to Section 1385 and at the time of sentencing, [to] strike or

dismiss an enhancement otherwise required to be imposed by this section." (Stats. 2017, ch. 682, § 2.)

Defendant contends remand is required to permit the trial court to exercise its discretion to strike the firearm enhancement under section 12022.53, subdivision (h). The Attorney General argues remand is unnecessary because it is apparent from the trial court's other discretionary sentencing decisions that it would not have stricken the firearm enhancement.

We agree with defendant. Senate Bill 620 applies retroactively to cases where the judgment is not yet final. (*People v. Woods* (2018) 19 Cal.App.5th 1080, 1090–1091.) "Generally, when the record shows that the trial court proceeded with sentencing on the erroneous assumption it lacked discretion, remand is necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing." (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.) Here, the trial court made no statements from which we can infer that it necessarily would have declined to strike the firearm enhancement.

### 2. *Prior Serious Felony Enhancement*

The trial court also sentenced defendant to consecutive five-year terms for the commission of a prior serious felony under section 667, subdivision (a) on counts one and two, as it was statutorily required to do at the time of defendant's sentencing. (Former § 1385, subd. (b); Stats. 2014, ch. 137, § 1.) Effective January 1, 2019, Senate Bill No. 1393 (2017–2018 Reg. Sess.) (Senate Bill 1393) amended sections 667, subdivision (a) and 1385, subdivision (b) to allow a court to exercise its discretion to strike or dismiss a prior serious felony conviction. (Stats. 2018, ch. 1013, §§ 1–2; see *People v. Garcia* (2018) 28 Cal.App.5th 961, 971.)

Defendant asks us to remand to permit the trial court to exercise its discretion whether to strike the prior serious felony conviction enhancements for sentencing purposes. The Attorney General argues remand is unnecessary. We agree with defendant. The amendments to sections 667, subdivision (a) and 1385, subdivision (b) apply retroactively to defendant because his case was not final when they took effect. (*People v. Garcia*, *supra*, 28 Cal.App.5th at p. 973.) Because those newly enacted laws provide the trial court with sentencing discretion it did not have at the time of defendant's sentence, we will remand for resentencing. (See, e.g., *People v. Johnson* (2019) 32 Cal.App.5th 26, 69 [remanding "out of an abundance of caution" for resentencing despite court's statements at sentencing reflecting lack of sympathy for defendants].)

## III. DISPOSITION

We modify the judgment to reduce defendant's conviction on count two to a violation of section 136.1, subdivision (a)(1). The matter is remanded to the trial court for resentencing on that count, and to allow the court to exercise its discretion whether to resentence defendant under Senate Bill 620 and Senate Bill 1393 with respect to the firearm and prior serious felony conviction enhancements. Following resentencing, the trial court shall issue an amended abstract of judgment and forward a certified copy to the California Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

MARGULIES, J.

WE CONCUR:

HUMES, P. J.

BANKE, J.

A151534
*People v. Phillips*